COUNTY OF NASSAU, Plaintiff, *v.* DANIEL LINCER and Others, Defendants.*

County Court, Nassau County, January 17, 1938.

* See *Village of Garden City* v. *Roeder* (165 Misc. 928),

*James L. Dowsey, County Attorney [Eugene R. Hurley* of counsel], for the plaintiff.

*Robert E. Tinsley,* for the Incorporated Village of Malverne.

*Samuel M. Levy* (who submitted a brief on behalf of the Village Officials Association of Nassau County, *amicus curiæ*).

*George L. Hubbell, Jr.,* for the Vil'age of Garden City.

JOHNSON, J. A motion by the plaintiff for judgment on the pleadings, consisting of the complaint and the answer of the defendant village of Malverne, presents a question of priority as between county taxes levied and sold by the county of Nassau under the Nassau County Tax Act (Laws of 1916, chap. 541, as amd.) and village taxes and assessments levied by the village of Malverne, a village within the county of Nassau incorporated under the Village Law.

The complaint alleges in substance that the taxes levied by the county on the real property in question for the year 1930 were in default, that such real property was sold by the county for non-payment of such taxes, were purchased by the county at such sale and a deed therefor made by the county treasurer to the county and that the county conveyed an undivided interest in said premises to the defendant Crowley. The complaint, therefore, alleges that the county and the defendant Crowley own the premises in question as tenants in common, and that the village of Malverne is made a party defendant because it claims a lien on the premises for unpaid village taxes levied prior to the year 1930 and for benefit assessments levied at various times, the liens of which taxes and assessments are claimed by the plaintiff to have been extinguished by the sale for unpaid county taxes which resulted in the deed to the plaintiff.

The defendant village in its answer raises two defenses. One is that the action may not be maintained for the reason that, although in form it is an action in partition, yet in substance it is actually an action in behalf of the county of Nassau to establish its title to the premises in question by virtue of the tax sale. The

complaint alleges that the county and the defendant Crowley are tenants in common. It does not allege that the village is a tenant in common, but on the contrary makes the village a party defendant in order to extinguish its possible adverse claim. The right to determine such claims in a partition action has been well established in this State.

In *Weston* v. *Stoddard* (137 N. Y. 119) a person out of possession alleging that he was actually a tenant in common was permitted to maintain an action in partition against persons who he alleged were tenants in common with him, but who were in fact claiming adversely to him.

In *Satterlee* v. *Kobbe* (173 N. Y. 91) the plaintiff alleged, as does the plaintiff in the present action, that he and certain of the defendants owned the lands as joint tenants, or tenants in common, and that certain other defendants claimed adversely and in hostility to them, setting up adverse possession under color of title. The complaint had originally been dismissed upon the ground that the latter defendants were not proper parties. The Court of Appeals reversed, holding that under section 1540 of the Code of Civil Procedure, which is now section 1021 of the Civil Practice Act, any person having a lien or interest which attaches to the property may be made a party defendant, which clearly implied that the plaintiff might join as defendants "persons in possession or who claim some interest, the nature or character of which is unknown. It is broad enough to include intruders, trespassers or persons claiming title or some right adverse and hostile to the plaintiff. It would seem to be plain that it was intended to permit the plaintiff to join as defendants parties claiming some interest in the property, although these persons might not in any legal sense be cotenants, but claiming adversely."

That the Court of Appeals was thus committed to the view that a joint tenant or tenant in common, although not in possession, may sue in a partition action in which all questions of title affecting the property may be tried and adjudicated with the same force and effect as in an ejectment action, has more recently been confirmed by that same court. (*Brown* v. *Feek*, 204 N. Y. 238; *Kellum* v. *Corr*, 209 id. 486; *Delcambre* v. *Delcambre*, 210 id. 460; *Beers* v. *Hotchkiss*, 256 id. 41.)

And the Legislature has so recognized by its amendment of section 1022 of the Civil Practice Act by chapter 665 of the Laws of 1929, wherein it was provided that when any defendant who is not a joint tenant or tenant in common with the plaintiff puts in issue the plaintiff's title or interest, all subsequent proceedings as to such defendant shall be the same as in an ejectment action.

Quite clearly, therefore, the plaintiff if it were an individual or a private corporation could maintain this action. Any doubt whether it is incompetent to maintain it because it is a county or municipal corporation is dissipated by the amendment of the Nassau County Tax Act by chapter 673 of the Laws of 1936. As appears from the content of that amendment, especially as it affects section 86 of the act, it is designed to give the county where it has purchased at its own tax sale the same rights and standing as an individual purchaser. It specifically authorizes the county to so purchase, to take deeds and to " perform all other acts to perfect the title of real estate thus acquired," and to cause to be " transferred or conveyed any interest in such land necessary to facilitate the perfection of the title thereto."

It necessarily follows that the county has the right to maintain this action and that the village's defense in that respect is not good.

The other defense set forth in the village's answer is that the lien of the village for taxes and assessments levied by it upon the property in question is equal or superior to the lien of the county taxes for the year 1930 for the non-payment of which the sale to the county was had. The answer sets forth village taxes levied by the village in the years 1927, 1928 and 1929, and a special assessment made by the village for street paving in 1928, all of which were prior in point of time to the levy of the county tax for 1930, as well as village taxes levied in the year 1930 and in subsequent years, and a special assessment made in the year 1931, all of which were levied or made subsequent to the levy of the county tax for the year 1930. It should be noted, however, that paragraph seventh of the complaint, although alleging that all of the special assessments were inferior to the county taxes and were extinguished by the county tax sale, makes similar allegation only with respect to general village taxes levied prior to 1930. The village taxes levied in 1930 and in subsequent years, that is, after the levy of the 1930 tax, are not in issue. The question, therefore, is whether the county tax of 1930, and the sale to the county for its non-payment were superior to and extinguished village taxes levied prior to 1930 and special assessments levied either prior or subsequent thereto.

In order properly to determine this question it may be well to approach the subject from the standpoint of historical background showing the difference between counties and towns on the one hand, and villages on the other.

The civil division of a State into counties had its origin in England and quite naturally that method of subdividing the State for the more convenient administration of government was early

adopted in the colonies in this country. Thus, by the act of 1683 the Colony of New York was divided into twelve counties (See Colonial Laws of New York, vol. 1, pp. 121, 267), and additional counties were later created by similar action, so that fourteen counties existed at the time of the adoption of the 1777 Constitution and were specifically recognized and continued by that instrument. During the colonial period the towns in New York were created by special charter and were likewise recognized by the 1777 Constitution which contained provisions for the continuance of elections of town officers. After the adoption of that Constitution, and by chapters 63 and 64 of the Laws of 1788, the State was divided into counties and towns. These acts were incorporated into the statutory revisions of 1801, 1813 and 1828, and subsequently additional counties and towns were created. Thus, counties and towns have been subdivisions for governmental purposes of the State ever since the State was created, and bore the same relation to the colony before that time.

As compared with counties and towns, villages are of comparatively recent origin in this State. No general provision for the incorporation of villages existed before the adoption of the 1846 Constitution, which contained a provision authorizing the Legislature to provide for the incorporation of villages. Prior thereto, some villages had been created by special acts and they continued so to be created thereafter and until the year 1874. Following the adoption of the 1846 Constitution, the Legislature, by chapter 426 of the Laws of 1847, provided generally for the incorporation of villages by application to the court. By chapter 291 of the Laws of 1870 the prototype of the present method of village incorporation was first adopted, and by the constitutional amendment of 1874 adding section 18 to article 3 of the Constitution the incorporation of villages by special acts was thereafter prohibited. That provision was continued in the 1894 Constitution, and by chapter 414 of the Laws of 1897 the present Village Law was enacted.

The distinction to be observed between counties and towns on the one hand and villages on the other is that the former are involuntary subdivisions of the State created by the State for governmental purposes, whereas the villages are voluntary corporations organized by the action of their own inhabitants for their own local benefit and limited by the statute as to population or as to area and extent. *Markey* v. *County of Queens* (154 N. Y. 675) is usually referred to as the leading case upon this subject. The court there pointed out that counties were in effect " subdivisions

of the governed territory, established for the more convenient administration of government and having such powers as were necessary to be exercised for the welfare, advantage and protection of the public within their boundaries " (p. 680). This was in accordance with the duty of the Legislature to so arrange the territory of the State into civil divisions and to so apportion among them governmental duties as would best conduce to the advantage of its citizens. Although counties and towns in this State have always been bodies corporate for certain purposes, they were, nevertheless, created primarily for the better and more convenient government of the State, so that their corporate powers were of defined and limited extent. A city, on the other hand, is a different type of municipal corporation and a clear distinction exists between such a corporation which is created by charter, is granted power to own and manage private property and is invested with particular franchises, and a muncipal corporation, such as a county or town, which is created for the purposes of State government and exercises certain political powers as one of the State's civil divisions (p. 684).

The principles established in the *Markey* case (*supra*) have recently been applied by the Court of Appeals in two cases involving the question of taxes as between county and town on the one hand and county and village on the other. (*Village of Kenmore* v. *County of Erie*, 252 N. Y. 437; *Town of Amherst* v. *County of Erie*, 260 id. 361.) The Erie County Tax Act is substantially similar to the Nassau County Tax Act. The county levies and collects not only State and county taxes but also the town taxes, taxes of special districts in the towns and school taxes. By the statute and by the warrant to the tax receiver, the latter is required out of the first taxes collected to pay the towns, special districts and school districts in full, and to pay the balance only to the county. The result naturally was that, if insufficient taxes were collected, the county tax or at least a portion thereof was paid to the towns and the districts, so that the county received only a portion of its county tax if any at all. Under the statute, however, the county might borrow against its unpaid taxes, and in the county alone rested the power to sell for unpaid taxes.

In the *Town of Amherst* case (*supra*) the town sought to recover the amount of unpaid taxes from the county and the county contended that it was not required to make up to the town the deficit in town taxes which included the taxes levied for special district improvement purposes which had been extravagantly incurred by the unwise action of the town. The court held, however, that if the expenditures and liabilities incurred by the town were for governmental purposes and were made in accordance with the

statute no legal question was created by the fact that they had been unwisely and recklessly incurred. It was pointed out that with respect to that portion of the town taxes raised for public improvements of the special districts, the town had issued bonds therefor pursuant to law, which bonds constituted a town obligation. It held, therefore, that the purposes for which these town taxes were raised were governmental, distinguishing the same from village taxes involved in the *Village of Kenmore* case (*supra*) in the following words: " The opinion in that case pointed out that counties are prohibited from expending money for other than county or governmental purposes; that villages are voluntary municipal corporations which may use the money collected from taxes for other than governmental purposes, and that, therefore, if the county were compelled to advance the amount for uncollected taxes to a village, it would be incurring indebtedness for other than a county or governmental purpose. The decision in that case has no application to the case at bar as the purposes for which the money sought to be obtained from the county in this case are governmental. Furthermore, they are for the purposes of a town, which like a county is a corporation formed for the purpose of carrying on local government as a political subdivision of the State, to which is delegated certain governmental duties by the State in order that the governmental duties of the State may be carried on to the best advantage of all the people of the State " (p. 373).

The statute involved in the *Kenmore* case was chapter 650 of the Laws of 1927, adding section 126-a and the following sections to the Village Law, whereby the function of collecting unpaid village taxes was shifted from the village to the county, the latter required to advance unpaid village taxes to the former, and the power to collect by tax sale transferred from the village to the county. This statute the court held to be violative of section 10 of article 8 of the Constitution, which prohibits any county, city, town or village incurring indebtedness except for county, city, town or village purposes. Citing and quoting from the *Markey* case (*supra*) the court said:

" A village is not, like a county, an involuntary corporation. Owners of property assessed for taxation may vote upon a proposition for the incorporation of territory as a village. (Village Law, § 9.) A village may take and hold real and personal estate absolutely or in trust for any public use, and its corporate powers extend beyond the field of local government and the administration of local affairs.

" Doubtless the Legislature, in the exercise of its power and the performance of its duty to ' arrange the territory of the State into civil divisions and to so apportion among them governmental duties,' may use the county and its officers for the performance of such governmental functions or duties as it sees fit. School districts are, like counties, governmental subdivisions of the State, though their governmental function is confined to education. The State uses the machinery of county government to supplement the machinery of the school districts where the latter proves insufficient in the collection of school taxes. (Education Law, §§ 434-439; Cons. Laws, ch. 16.) These provisions of the law are perhaps in many respects analogous to the provisions of the Village Law now under consideration. Not in all. In the one case a burden is placed upon the county and all its inhabitants to assist a subordinate governmental subdivision in the exercise of a power and the discharge of a duty of local government. Moneys paid to a school district may be used for no other purpose, and since that purpose is governmental, it is a county purpose. (*Horton* v. *Andrus*, 191 N. Y. 231.) A city or village holds the proceeds of taxation as its corporate property. It may use the moneys received as it pleases for purposes of local government or for any other purpose within its corporate powers. In placing upon the county the burden of providing moneys to be used by the village for village purposes, the government of the State is not applying moneys of a governmental subdivision to governmental purposes performed through the agency of a subordinate subdivision. To the extent that the village has corporate powers which are not governmental; to the extent that the village is incorporated for purposes outside the field of local government and administration for which counties are formed, it is more than a governmental subdivision. (*Matter of Northern Bank of New York*, 85 Misc. Rep. 594; affd., on opinion below, 168 App. Div. 974; affd., 212 N. Y. 608.) Furnishing money which a village may use for purposes not governmental nor of State concern is not a county purpose. (*Horton* v. *Andrus*, *supra; State ex rel. Town of Kirkwood* v. *County Court*, 142 Mo. 575, at p. 584; *Commissioners of Johnston County* v. *Lacy*, 174 N. C. 141.) " (pp. 442, 443).

Bearing in mind the clear distinction between the county and the town on the one hand, and the village on the other, as stated in the authorities above cited, the next step is to examine the tax statutes as affecting both. The tax levied and collected by the county includes the State tax, if any, the county tax the town tax, including the special districts of the town and the school taxes.

The village tax is solely a tax of and for the village and there is conferred upon the village no power or duty with respect to State, county or town taxes.

The Nassau County Tax Act provides for the levy of the tax by the board of supervisors and the issuance by that board of warrants for its collection to the receivers of the towns who act as independent officers in the performance of their duties. The tax receiver collects the tax for a two-year period and then returns the list of unpaid taxes to the county treasurer. The county treasurer then holds a sale for the unpaid taxes. Upon a sale a certificate is issued to the purchaser. An extraordinarily long period of four years is allowed for redemption, at the expiration of which, if the necessary steps have been taken and the lands sold have not been redeemed, the holder of the certificate receives from the county treasurer upon his paying " all outstanding prior tax liens held by the county upon the premises " a conveyance of the real estate sold, which conveyance " shall vest in the grantee an absolute estate in fee, subject to all claims which the county may have thereon for tax or other liens or incumbrance." (§ 93, as added by Laws of 1919, chap. 154.) In that respect the Nassau County Tax Act is substantially the same as the Tax Law which provides that in case of sale by the State for unpaid taxes the conveyance to the purchaser " shall vest in the grantee an absolute estate in fee simple, subject to all claims which the State may have thereon for taxes or other liens or incumbrances " (§ 131), and in case of such sale by the county treasurer, such conveyance " shall vest in the grantee an absolute estate in fee, subject, however, to all claims the county or State may have thereon for taxes or liens or incumbrance " (§ 154). Those sections of the Tax Law are the same as sections 131 and 153 of the 1896 Tax Law (Laws of 1896, chap. 908) which in turn constituted sections 11 and 34 of chapter 711 of the Laws of 1893, which act provided for sales by the county treasurer as well as by the State officers. That act in turn was derived from Laws of 1855, chapter 427, section 63, and Laws of 1850, chapter 298, section 81, both of which made the same provision as to the effect of the conveyance to the purchaser at a tax sale. Indeed the same provision existed in the Revised Statutes of 1829, part 1, chapter 13, article 3, section 80. Thus it is apparent that the history of the sale of lands for unpaid taxes goes back to the early life of the State and that the statutes have consistently provided that the purchaser at the tax sale shall receive a conveyance vesting in him an absolute estate in fee, subject to State and county taxes. If these statutes were in no way affected by any other legislative enactment, I think it is quite clear that

a conveyance following a sale for unpaid county taxes would vest title in the purchaser free and clear of all taxes and assessments other than State and county taxes.

The first general act for the incorporation of villages (Laws of 1847, chap. 426, § 50) provided only that village taxes should be " a lien upon the real estate upon which they shall be assessed," and that if they were not paid the board of trustees might lease the property for the shortest period, not exceeding five years, that a purchaser would take it and pay the taxes. The General Village Act of 1870 (Chap. 291) removed the five-year limitation and authorized a sale to the person who would take the property for the shortest period of time and pay the taxes. It further provided that he should receive a certificate of sale, serve notice thereof upon the owner and if not redeemed within six months, record his certificate as a deed.

The Village Law of 1897 (Chap. 414) limited the period for which sale might be made to a period not exceeding fifty years. (§ 119.) It further provided that the certificate of sale might be recorded within two years after the tax became a lien, and if so recorded, it should have " the same effect as the recording of a deed to give the certificate priority over every interest therein or lien thereon acquired subsequent to the lien of the tax; but unless such certificate is recorded within such time, it shall be void as to such other interest or lien." (§ 121.) By that act, sections 113 and 116 were for the first time added to the Village Law. Section 113 provides that an assessment for a local improvement " is a lien prior and superior to every other lien or claim, except the lien of an existing tax or local assessment." Section 116 provides similarly as to the annual village tax. These sections clearly subordinate the annual village tax or a village assessment to any existing tax or assessment, that is, to any tax or assessment levied prior thereto, while the provisions of section 121 give such annual village tax or assessment priority over liens acquired subsequent to the liens thereof only in the event of a sale and recording of the certificate of sale.

By chapter 446 of the Laws of 1899, section 133 was added to the Village Law, giving the village an additional method of collection of unpaid taxes by absolute sale, instead of for a term of years, in which case " The foregoing provisions of this article in relation to the conduct of a sale and the rights and remedies in respect to the real property sold shall not be applicable, but the village treasurer and the board of trustees shall possess all the powers and be subject to all the duties of a county treasurer and a board of supervisors under articles six and seven of the Tax

Law; and such articles shall, so far as practicable, apply to a sale authorized by this section."

Up to that time it seems evident that the Legislature had not in any of the provisions of the Village Law given a village tax priority over a State and county tax. Although the provisions for tax sales in the case of State and county taxes whereby the purchaser acquired a fee subject to State and county taxes had been established in the law at least since 1828, the provision upon which the village relies in its claim for priority, or at least equality, was not enacted until the enactment of sections 113 and 116 of the Village Law in 1897, and which specifically made village taxes subject to taxes existing when the village tax was imposed, and which by section 121 gave priority over taxes subsequently imposed only in the event of sale and recording of the certificate of sale within the required two-year period; while the amendment of 1899 authorizing absolute sales, placed the village exactly within the provisions of the general Tax Law whereby a conveyance by the county treasurer to a purchaser at a county tax sale gave the grantee a title subject only to State and county taxes. However, in 1927, by chapter 650 of the Laws of 1927, as pointed out above, the Legislature attempted to transfer to the county the collection of unpaid village taxes, but at the same time provided in section 125-a that while generally the old method of collection should remain applicable to taxes levied before 1927 and the new method to taxes levied in 1927 and thereafter, villages in the county of Westchester should be excepted therefrom and in such villages the old method should continue and the new method not be applicable and, by chapter 856 of the Laws of 1928 this section was amended so as to include within the exception villages in Nassau county as well as in Westchester.

As has already been pointed out, chapter 650 of the Laws of 1927 was held unconstitutional in the *Village of Kenmore* case (*supra*) in the year 1929, with the result that in the following year, by chapter 661 of the Laws of 1930, the Legislature, although it did not repeal section 125-a relating to villages in Nassau and Westchester counties, did repeal sections 119 to 123, both inclusive, 133 to 138, both inclusive, relating to sales by the village for unpaid taxes, as well as the sections added by chapter 650 of the Laws of 1927, and in place thereof added the present section 126-d, providing for foreclosure of the certificate of sale. By this act the Legislature did away with the method of selling by lease and by absolute deed but left existing the right to maintain an action for unpaid taxes and added the new provision for foreclosure of the tax sale certificates. By these enactments, however, no provision was

added which would change the theretofore existing situation as to equality or priority as between village and county taxes, so that the contention of the village in that respect must still rest on sections 113 and 116 of the Village Law, which have remained unaffected by the recent legislative action concerning sales for non-payment of village taxes.

In the light of the established law and the statutes as to counties and towns on the one hand, and villages on the other, and their respective taxing powers, it is necessary to consider the question of priority (1) as between general county and State tax and special village assessments, and (2) as between general county and State tax and the annual village tax.

As to special assessments the general rule is that, in the absence of statutory provision to the contrary, the lien of a general tax is superior to that of a special assessment. (61 C. J. 932.) Unless the Legislature clearly announces that other liens shall be superior or equal thereto, the lien for general taxes is the superior lien. (61 C. J. 933.) The reason for the rule is well stated in *Bosworth* v. *Anderson* (47 Ida. 697; 65 A. L. R. 1372; 280 P. 227). There the statute provided that the lien of a tax could be discharged only by payment, cancellation or rebate, but also provided that a special assessment " ' shall have priority over all other liens and encumbrances whatsoever.' " Special assessments are not " taxes " in the strict sense of the word because (1) they are not assessed for governmental purposes; (2) they are based on the theory of special benefit to the property assessed. The appellant asserted the rule to be that the Legislature must clearly have stated that taxes have priority over special assessments before such priority may be allowed. The court held to the contrary and stated the rule to be just the opposite, namely, that taxes are superior to special assessments unless the Legislature has clearly announced that special assessments are to have priority. (Citing decisions in Washington, Kansas, Missouri, Montana, Nebraska and New Jersey. See, also, Annotation to *Bosworth* v. *Anderson*, 47 Ida. 697; 65 A. L. R. beginning at p. 1379; 280 P. 227.)

In some States the statutes expressly give general taxes priority over special assessments, in others it follows by implication. In the absence of statute it is generally held that a general tax lien, subsequent in point of time, is superior, that the last tax is the paramount lien. (*Fletcher* v. *Oshkosh*, 18 Wis. 228; *McCollum* v. *Uhl*, 128 Ind. 304; 27 N. E. 152.)

" It must be conceded that a general tax which has primarily for its object the support of the government whereby the government may exist, and lives and property may be protected and the pursuit

of happiness guaranteed, is of greater dignity and more importance than a tax bill issued for public improvements. It is true that a general tax is frequently levied for public improvements. But it is not feasible to levy a special tax, of the nature here involved, for what we understand to be meant by the expression 'support of the government.' We can subsist without the special tax, but no civilized government could be organized and maintained without the general tax. So we conclude that the general tax being first in vital importance should be allowed first place in the means of payment." (*Missouri Real Estate & Loan Co.* v. *Burri*, 202 Mo. App. 242; 216 S. W. 570; and to the same effect see *McMillan* v. *Tacoma*, 26 Wash. 358; 67 P. 68.)

Where a city charter provided that a special assessment should be deemed a tax and should be a lien having priority " over all other or subsequent liens or encumbrances whatever," the court, holding that a general tax lien, although subsequent in time, was prior and superior to a lien for special assessments, said: " We do not think that the Legislature ever intended to enact a law which would give priority to a city lien for street improvements over the lien of taxes levied for governmental purposes. In legal effect such a law would make the whole system of our State government and its institutions subordinate and inferior to the municipal administration of the City of Eugene." (*Studley* v. *Luse*, 89 Ore. 338; 173 P. 1182.)

In the case of *Commerce Trust Co.* v. *Syndicate Lot Co.* (208 Mo. App. 261; 232 S. W. 1055) the question was as to priority between a general city tax and a city special assessment for local improvements. The city charter provided with respect to the deed to be given a purchaser at a sale for unpaid general city taxes, that it should vest in the grantee an absolute estate in fee simple " free from any and all encumbrances of whatsoever kind or nature, subject, however, to all unpaid State, county and city taxes, general and special taxes or assessments which are a lien thereon." The court held that, although the city under its charter might subordinate the rights of a purchaser at a sale for unpaid general city taxes to the lien of special assessments, yet the lien of the State for its taxes is paramount to all other liens.

As applied to the instant case, the rule would be, if the statute were silent, that the general county tax has superiority and priority over the village special assessment. The Legislature of this State early established a system whereby the collection of State and county taxes was made paramount, to be made effectual by a sale of the taxed property followed by a conveyance which should vest in the purchaser an absolute estate subject only to State and

county taxes; and it has continued that system down to the present, providing that in all cases " the assessment shall be deemed as against the real property itself, and the property itself shall be holden and liable to sale for any tax levied upon it." (Tax Law, § 9.) Surely, therefore, it may not be said that the Legislature clearly announced a contrary rule by the enactment of section 113 of the Village Law in 1897, providing that a special assessment should be a " lien prior and superior to every other lien or claim, except the lien of an existing tax or local assessment." By the act itself a special assessment is subordinated to a tax or assessment existing when the special assessment became a lien; and as to special assessments levied thereafter the section must be construed in the light of the general principles of law and the statutory provisions whereby a State and county tax for governmental purposes takes precedence over a local assessment for benefit, the tax last levied is the paramount tax, and the purchaser at a sale for such unpaid tax takes a title which is absolute except as to State and county taxes. It necessarily follows that a county, by virtue of the conveyance to it following sale for the unpaid 1930 county tax, acquired a title superior to the special village assessments of the years 1928 and 1931.

It remains then, to consider the question of priority as between the annual village taxes of the years 1927, 1928 and 1929, and the county tax for the year 1930.

In ordinary cases involving priority of liens other than taxes, the rule is that the lien first in point of time has priority. As between several similar tax liens the reverse is true. Tax liens take priority in the reverse order of other liens. " The last tax is the paramount tax." " The last in time is the first in right." (See authorities cited *supra;* see 61 C. J. 931; *Gould* v. *City of St. Paul,* 120 Minn. 172; 139 N. W. 293; Cooley on Taxation [3d ed.], p. 875.) Hence, except as changed by statute, the general rule is that a purchaser at a tax sale takes a title free from the liens of all taxes assessed for any years previous to the year for the tax of which the sale was had. (61 C. J. 1313, and authorities there cited.) " This rule is one of necessity, growing out of the imperative nature of the demand of the government for its revenues." (*Auditor General* v. *Clifford,* 143 Mich. 626; 107 N. W. 287.)

It has been stated that taxes levied by a municipality for municipal purposes are generally not inferior in rank to taxes levied for State or county purposes. (61 C. J. 931, citing in support thereof *St. Clair* v. *Jones,* 58 Ind. App. 280, and *Gamet's Estate* v. *Lindner,* 159 La. 658; 106 So. 22.) Those decisions, however, rested upon

the theory that the municipal tax was, like the State tax, a tax levied for governmental purposes. Under statutes such as exist in this State, however, the lien of the State for its taxes is held to be paramount to that of a municipality. (See *Paducah* v. *Green*, 12 Ky. Op. 701, 702.) In that case the statute provided that the purchaser at a tax sale acquired a title free from all claims or liens except State taxes subsequently assessed. The court held that the provision was surely enforcible against municipalities whose right to tax is a delegated power that may be withdrawn or exercised as the Legislature in its discretion may think best, saying " the lien of the city being inferior is lost when the whole estate has been sold to pay the taxes due the State."

Unless changed by the Village Law, it would seem that the New York statutes as to State and county taxes accomplish the same result. It is the real property itself, and not any particular interest therein, that is assessed and that is sold for non-payment of the tax thus assessed. The State and county tax last assessed and levied is the paramount tax. This must necessarily be so if the tax is to be collected and government to survive.

Obviously it is for this reason that the absolute title which the Legislature has said shall vest in the purchaser is subjected to State and county taxes, so that their payment may be assured; an object attained by the provision of the Nassau County Tax Act (§ 93) requiring the purchaser, in order to procure a conveyance, to pay " all outstanding prior tax liens held by the county."

The provision of the Village Law which is contended to reverse that principle is section 116 which provides that the annual village tax shall be a lien " prior and superior to every other lien or claim except a lien of an existing tax or local assessment," exactly the same provision contained in section 113 of the Village Law with respect to local assessments. May it be said that this provision, enacted in 1897, destroys the effect of the provisions of the general tax laws in existence since 1828, and continued since 1897, and especially of the Nassau County Tax Act enacted in 1916? I think that the history of legislation and decisions in this State with respect to counties, towns and villages, and the method of taxation, as well as logic and reason, compel a negative answer. If the statutes are apparently in conflict, they must be reconciled if possible. The Tax Law and the Nassau County Tax Act are clear and explicit. They are in accord with the general principle that a State tax for governmental purposes is paramount, that the tax last levied is the best tax, and that the sale for such unpaid tax should vest in the purchaser a title absolute except as to State taxes. Section 116 of the Village Law must be read in the light

of those principles and statutes. In its enactment the Legislature must be presumed to have had in mind the rule of priority as among taxes, and to have further subordinated the village tax not only to subsequent, but also to existing taxes.

The same conclusion must be reached, I think, from an examination of the precedents in the courts of this State. In that respect *Village of Kenmore* v. *County of Erie* (252 N. Y. 437) and *Town of Amherst* v. *County of Erie* (260 id. 361) are particularly illuminating. The quotation above from the opinion in the *Kenmore* case (at pp. 442, 443) is especially appropriate, so clearly explaining the difference between county and town and county and village taxes. The county and State tax is clearly a governmental tax. So is the school tax and the town tax, although the latter may include taxes for special district purposes. There, too, it was urged that the village tax was also, at least to some extent, a governmental tax. That they were analogous in some respects was admitted, but not in all. " In the one case a burden is placed upon the county and all its inhabitants to assist a subordinate governmental subdivision in the exercise of a power and the discharge of a duty of local government " (p 442).

" A city or village holds the proceeds of taxation as its corporate property. It may use the moneys received as it pleases for purposes of local government or for any other purpose within its corporate powers " (p. 442). " To the extent that the village has corporate powers which are not governmental; to the extent that the village is incorporated for purposes outside the field of local government and administration for which counties are formed, it is more than a governmental subdivision " (p. 443).

In the *Amherst* case, likewise, the court pointed out that under the Town Law the special districts for which taxes were included in the town tax were created, each for a governmental purpose (p. 368), and that such taxes were requisite to meet payment of town indebtedness incurred for such districts (p. 372). Considering the provisions of the Erie County Tax Act, it pointed out that the Legislature may well have had in mind, in providing for the sale of lands for unpaid county taxes and their purchase by the county in default of another purchaser, that the property would ultimately be sold for at least the tax assessed against it, plus interest and penalties, so that the county would ordinarily receive in the end the amount of the returned taxes with such interest and penalties, thus recouping the amounts in effect advanced to the towns; and that this was consistent with the statutory provisions with respect to taxes as between State and county, whereby, when the county sells for taxes it must pay the State tax (Tax Law, § 91. See Tax Law,

§ 157), and where the State sells for unpaid taxes it must pay the county.  (Tax Law, §§ 103, 157.)

" The State having authorized the town to incur a bonded liability for governmental purposes cannot be presumed to have intended that it should be deprived of the means of paying its obligations by having its right to collect unpaid taxes transferred to the county without any obligation on the county's part to reimburse the town " (p. 377).  And it was because the town is a civil subdivision of the State created for governmental purposes that its taxes were held to be governmental and, therefore, properly financed by the county, as contradistinguished from the taxes of a village which is a voluntary municipal corporation, and may use its tax moneys for other than governmental purposes, with the result that, if the county were compelled to advance to the village the amount of its uncollected taxes, it would be incurring indebtedness for other than a county or governmental purpose (p. 373).

It is difficult to escape the conclusion, from the reasoning in the *Kenmore* and *Amherst* cases, that the State, county and town taxes are governmental only, while the village tax, although all or part of it may be devoted to governmental purposes, is not required to be, and may be used for any corporate purpose, thus making it more analogous in character to a local assessment.  If that be so, clearly the general county tax would be superior to the village tax.  Furthermore, if the contention of the village is correct, it seems that it might well result in just the contrary of the decision in the *Kenmore* case.  If the village tax is superior the village may levy tax after tax during the period of six or seven years before the county may convey following a sale for its own unpaid taxes, and if the county is the purchaser it would be compelled, in order to perfect its title, to pay the village all its arrears of taxes, which would be exactly what was condemned as unconstitutional in the *Kenmore* case.  Surely an intent on the part of the Legislature to bring about such a result full in the face of the *Kenmore* decision may not be implied.

And, finally, I am of the opinion that the decision in *Pickell* v. *City of Utica* (161 App. Div. 1; affd., 216 N. Y. 740) constitutes an authoritative precedent.  In that case the city taxes of the years 1899 to 1904, both inclusive, upon certain premises being in default, the city held a sale of the premises for the unpaid taxes and became the purchaser.  Thereafter the same premises were sold by the county for unpaid county taxes of the years 1904, 1907, 1908, 1909 and 1910, to an individual purchaser to whom deeds therefor were given and recorded.  He contended that the city's interest under its tax sale certificates was cut off by the county tax sale and

deeds in pursuance thereof. His contention was sustained upon the opinion of Mr. Justice CROUCH, and the Court of Appeals affirmed without opinion. The statute under which the county tax sale was held and the deeds given to the plaintiff provided that the conveyance "shall vest in the grantee an absolute estate in fee, free from all liens, claims and encumbrances of every name and nature whatsoever, subject only to such claims as the State of New York and county of Oneida may have thereon for taxes or other liens," and that " every such conveyance shall vest in the grantee an absolute estate in fee simple, subject to all claims which the State may have thereon for taxes or other liens or incumbrances."

The defendant contended that the rule was well settled in this State that tax sales made by the sovereign, whether in its capacity as a State, county or municipality, do not in any wise interfere with the other liens of the sovereign in either of those capacities. The court held that the authorities cited by the defendant in support of that contention established no such broad doctrine, but were based on different statutes and different facts; and that, if any general rule could be deduced from them, it was in substance that all tax liens will be preserved unless the statute indicates clearly a contrary intent, upon the theory that it is the policy of the law to insure the collection of all taxes.

Thus the court clearly distinguished the case here relied upon by the defendant village (*City of Rochester* v. *Kapell*, 86 App. Div. 224; affd., 177 N. Y. 533) because in that case the statute provided that the tax sale deed should vest an absolute estate in fee in the grantee, not subject to State and county taxes only, but subject to " all the claims which the *people of the State* may have thereon, for taxes or other liens or encumbrances," which included city, as well as State, and county taxes. But, as Mr. Justice CROUCH pointed out, where State and county taxes are specifically excepted there can be no doubt that State and county taxes, as those terms are ordinarily understood, are alone referred to.

I am aware that the State Tax Commission has expressed its opinion that, under the Nassau County Tax Act and the Village Law, a sale for county taxes does not cut off village taxes. (52 State Dept. Rep. 23.) It distinguishes the *Pickell* case upon the ground that the Oneida statute there involved provided that the tax sale deed should vest an absolute estate subject " only " to State and county taxes, while the Nassau County Tax Act does not use the word " only." I cannot concur in that distinction. The Oneida statute in one section, excepting both State and county taxes, uses the word " only," and in the other section, excepting State taxes, does not, but uses exactly the phraseology of the Tax

Law and the Nassau County Tax Act. I cannot believe that the Legislature intended thereby to discriminate between State and county taxes, for if it did its discrimination would have favored the county as against the State. Nor does it appear from the opinion of Mr. Justice CROUCH that he placed any weight upon the use or non-use of the particular word, for he said (p. 4), " but when the saving clause of the statute, as here, exempts ' *such claims as the State of New York and the county of Oneida may have thereon for taxes*,' there can be no doubt that reference is specifically made to State taxes and county taxes as those terms are ordinarily used and understood. *If that be so, there can be as little doubt that the omission to include the city of Utica in the saving clause was intentional and significant*."

Even more recently a similar clause has been similarly construed by the Court of Appeals. Lands in the county of Suffolk were sold for unpaid county taxes by the county treasurer, bought in by the county, and subsequently conveyed by the county to the defendant. In the meantime other taxes had been levied, were unpaid, and for their non-payment the land was sold to the plaintiff. It was held that title vested in the defendant free from other tax liens and from plaintiff's claim by virtue of the provision in the county's deed to the plaintiff " subject to any claims or liens thereon which may exist in favor of the State," the court citing *Pickell* v. *City of Utica (supra)*, and saying, " That exception excluded claims or liens in favor of the county." (*Robbins* v. *Abrew*, 275 N. Y. 233, 237.)

If a statute which provides that a tax sale deed shall vest absolute title, subject to liens of the State, excludes county taxes, then surely a statute providing that such a deed shall vest absolute title subject to State and county taxes must necessarily exclude village taxes.

From all that has been said, therefore, I am impelled to the conclusion that in this case the county tax of 1930, which ripened into a sale and conveyance to the county, vested title in the county superior to the lien of the village taxes of the years 1927, 1928 and 1929. The 1930 county tax was a tax upon the property itself for the payment of which the property itself was bounden and could be sold. With respect to the 1927, 1928 and 1929 village taxes, it was the last tax in time and, therefore, the first in right and the paramount tax. While no action or proceeding was apparently taken by the village to enforce collection of its taxes during the exceptionally long period required under the Nassau County Tax Act for the county to sell and give title, the county proceeded to do so under a statute which vested in it an absolute title, subject only to county and State taxes, which taxes, and

which taxes only, the statute required to be paid as a condition precedent to obtaining a deed. Under such circumstances the liens of the 1927, 1928 and 1929 village taxes were subordinated to the lien of the 1930 county tax, and were cut off by the sale for non-payment of the latter tax and conveyance to the county.

It follows that the defenses in the answer of the defendant village are insufficient in law, and that plaintiff's motion for judgment on the pleadings must be granted.